**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>**Plaintiff,**<br><br>vs.<br><br>KATHERINE L. WOITASZEWSKI,<br><br>**Defendant.** | **8:25CR129**<br><br>**FINDINGS AND<br>RECOMMENDATION** |

This matter comes before the Court on the Motion to Suppress (Filing No. 22) filed by Defendant, Katherine L. Woitaszewski. Defendant seeks to suppress evidence and statements arising out of a traffic stop and search of her vehicle. (Filing No. 22). Defendant filed a brief (Filing No. 22-1) in support of the motion. The Government filed a brief in opposition (Filing No. 35).

The Court held several status conferences regarding the motion by telephone with counsel between September 2, 2025, and January 9, 2026. (Filing No. 24; Filing No. 40; Filing No. 76; Filing No. 84; Filing No. 88). The Court held an evidentiary hearing on the motion on February 19, 2026. (Filing No. 91). Defendant was present with her attorney, Paul Forney. The Government was represented by Assistant United States Attorney, Thomas Kangior. The Court received into evidence, without objection, the Government's Exhibits 1-6. Deputy Daniel Eads ("Deputy Eads"), Deputy Johnathan Smolen ("Deputy Smolen"), and Sergeant Robert Stern ("Sergeant Stern"), all employed with the Douglas County Sheriff's Office, testified at the hearing on behalf of the Government. A transcript (TR.) of the hearing was prepared and filed on March 15, 2026. (Filing No. 98). The matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge will recommend that the motion be denied.

**BACKGROUND**

The charges in this case arise out of a several-year joint local and federal law enforcement task force investigation into a Mexican drug trafficking organization operating in the Omaha, Nebraska area. (TR. 9-10). In the morning on May 27, 2025, joint task force officers were conducting surveillance of a silver Nissan Versa after its occupants delivered a pound of methamphetamine to an FBI informant during a controlled buy. (TR. 9-10, 13, 36-37). Deputy

Eads[1] observed the controlled buy and followed the Nissan to a residence at 33rd Street and Lake Street in Omaha. (TR. 10, 36). Officers obtained pictures of the two Hispanic male drug couriers in the Nissan. (TR. 37-38).

Later that same night, Deputy Eads, Deputy Smolen,[2] Sergeant Stern, and over twenty other narcotics officers were conducting surveillance in a laundromat parking lot near Saddle Creek and Cuming Streets during the course of an unrelated fugitive investigation. The surveilling officers kept in communication with one another via an encrypted radio channel. (TR. 11-12, 49-50). During this surveillance, Deputy Eads and Deputy Smolen saw a Nissan pull into the same parking lot where law enforcement were conducting their operation; the officers identified it as the same Nissan observed during the controlled buy earlier in the day because it bore the same license plates. (TR. 11-12, 37, 45-46, 49-50). Deputy Eads testified he was "able to positively ID" the individuals in the Nissan as the same Hispanic male drug couriers observed during the morning controlled buy. (TR. 38, 40).

Deputy Smolen testified he observed the Nissan pull into the laundromat parking lot next to a maroon Yukon SUV. Deputy Smolen then observed the female the driver of the Yukon— later identified as Defendant—exit the Yukon and enter the Nissan's backseat for three to five minutes before exiting the Nissan to return to her vehicle and drive away. Deputy Smolen testified he could not see whether Defendant had anything in her hands when she exited the Nissan because he was approximately 50 feet away. (TR. 51-53, 68).

Deputy Eads testified he was "in the next parking lot over" so he did personally not see the laundromat parking lot interaction, but Deputy Smolen relayed his observations to the other officers over the encrypted radio channel. (TR. 13-14). Deputy Eads testified that immediately after the Yukon left the laundromat parking lot, it pulled into the parking lot next to where Deputy Eads was sitting in his parked truck. (TR. 14, 41). Deputy Eads then observed Defendant exit the Yukon, open its hood, and place a black bag inside the engine compartment next to the "A-pillar" on the driver side before closing the hood and driving away. Based on Defendant's actions and

---

[1] Deputy Eads has been employed with the Douglas County Sheriff's Office for nine years and was assigned to the Homeland Security Task Force for the FBI to investigate cartels. (TR. 9).

[2] Deputy Smolen has been employed with the Douglas County Sheriff's Office in the Special Operations Unit for seven years, and was currently working with the Special Operations Group investigating street crime, gang, and gun violence, and apprehending fugitives. (TR. 49).

Deputy Eads' experience, he believed he just observed Defendant concealing narcotics. (TR. 15-16).

Based on these observations, Deputy Eads radioed his request that a traffic stop be initiated on Defendant's vehicle. (TR. 46). Deputy Smolen, who was driving an unmarked cruiser with no recording device, initiated a traffic stop of Defendant after he observed the Yukon's "third high-mounted brake light" was malfunctioning and that its front license plate was improperly affixed. (TR. 55, 56, 58).

Deputy Smolen testified he was wearing a body camera at the time of the stop; however, he muted his audio at certain times when discussing tactics or decisions related to the traffic stop, occasionally forgetting to reactivate the audio during the course of Defendant's stop and arrest. (TR. 56-58; Ex. 5-6). Deputy Eads testified his body camera was out of battery and was not recording. (TR. 32). Body camera video from officers Benes (Ex. 2), Trindle (Ex. 3), and Kieser (Ex. 4) also capture different views of the stop.

Deputy Smolen's body camera reflects he initiated the traffic stop of the Yukon at approximately 9:06 p.m., and Defendant parked her vehicle in a Walgreens parking lot. (Ex. 5 at 0:35-45; TR. 16, 56). Deputy Smolen approached the driver's side of the Yukon and told Defendant who he was, what agency he was with, and that he stopped her due to the Yukon's malfunctioning brake light and improperly affixed plates. Defendant seemingly acknowledged those issues. (TR. 58; Ex. 5 at 0:45-1:11).

Deputy Smolen asked Defendant for her license and registration, and also asked for the female passenger's identification. The female passenger was later arrested after a records search showed she had an outstanding warrant. (TR. 19, 59; Ex. 5 at 1:13-25). Defendant mentioned she was driving her boss's vehicle, and confirmed she had permission to drive it. Deputy Smolen asked Defendant where they were coming from and going to. During this time Defendant was looking through her phone for proof of insurance. (Ex. 5 at 1:25-3:55). Deputy Eads, Deputy Kieser, and several other officers arrived to assist in the stop. (TR. 16). Deputy Smolen returned to his vehicle with the Yukon's occupants' information, telling the other responding officers that he "didn't see anything in plain view," and stated, "you might want to get a dog." (Ex. 5 at 3:55-4:40). Deputy Smolen then muted his body camera, but the video continued recording as the deputies processed the stop and the Defendant's and passenger's information. (Ex. 5 at 4:40-6:30).

3

One of the responding officers ran Defendant's information and learned she was on supervised release. (TR. 44-45). At approximately 9:13 p.m., Deputy Smolen reapproached Defendant, who was still sitting in the driver's seat of the Yukon, and apparently engaged in further discussion and wrote down a phone number,[3] which audio was not captured by his still-muted body camera. (Ex. 5 at 6:55-8:02). At approximately 9:14 p.m., the deputies asked Defendant to exit the vehicle, and she complied. She was not placed in handcuffs, and Deputy Smolen reactivated the audio on his body camera. (TR. 17-18; Ex. 5 at 8:20-8:45). Deputy Eads talked with Defendant outside the vehicle for a few minutes, asking her if there was anything like guns or knives in the car. (Ex. 5 at 8:45-9:50).

One of the responding officers attempted to contact Defendant's probation officer at approximately 9:19 p.m., but the probation officer did not answer her phone. (TR. 44-45; Ex. 5 at 13:00-13:32). Deputy Eads testified he asked Defendant for consent to search her vehicle, which she declined, and Deputy Eads ultimately made the decision to call for a drug K-9 unit. (TR. 18, 58-60).

As the stop progressed, Defendant stood unrestrained outside of a police vehicle, periodically engaging in conversation with the deputies. At approximately 9:25 p.m. Defendant asked if she could go into Walgreens to buy a bottle of water "if I am not being detained"; Deputy Eads replied no, she was being detained and informed her she could not leave until the K-9 got there. (TR. 19-20; Ex. 5 at 18:45-19:00). Deputy Eads testified that Defendant asked him why they were waiting for the K-9, and he responded that "we believed there was narcotics in the vehicle." At approximately 9:27 p.m., while waiting for the drug canine, Defendant mentioned there was a "nugget," referring to a single bud of marijuana. Deputy Eads asked, "there's a nugget?" and Defendant replied, "yes" and the "tiniest little f-ing piece." Deputy Eads asked how much there was, and Defendant replied with a statement sounding like, "I don't know, an ounce?" Deputy Eads testified that Defendant indicated the nugget of marijuana was next to the passenger seat in the center console. (TR. 20, 71; Ex. 5 at 19:10-21:20).

Because Defendant indicated she had marijuana in the vehicle, Deputy Eads requested Deputy Smolen search for it. Deputy Smolen located marijuana between the center console and the passenger seat. (TR. 60-61). After discovery of the marijuana, deputies conducted a full search

---

[3] Presumably Defendant's probation officer's phone number.

of the Yukon, including opening the hood where they located a "large quantity" of suspected methamphetamine in a black bag.  (TR. 21-22, 61).

It is unclear precisely when the K-9 unit arrived, but it was a few minutes after the search and recovery of methamphetamine and marijuana from the Yukon, and after Defendant was arrested, at approximately 9:33 p.m. to 9:34 p.m.  (Ex. 5 at 27:15-30:05; Ex. 2 at 27:00-27:30).  Although the deputies had already searched the Yukon, the K-9 officer still wanted to deploy the dog "for training and experience."  (TR. 22).  Deputy Eads testified the K-9 was deployed and indicated to the odor of narcotics on the driver side of the Yukon.  (TR. 22-23).

After the search, Defendant was placed in handcuffs and transported by Deputy Smolen to the Douglas County Sheriff's Office for an interview. (TR. 61).  Deputy Smolen testified Defendant "asked some questions" during the drive, but he did not interrogate her before she was read her *Miranda* rights.  (TR. 61, 65; Ex. 6).  Deputy Eads testified no one attempted to interview Defendant at the scene of the traffic stop.  (TR. 23-24).

Defendant was placed in an interview room at the sheriff's office at approximately 10:20 p.m.  (TR. 31).  Deputy Smolen testified there is "supposed to be" a recording device in interview rooms, but on this occasion it was "malfunctioning," a fact which Deputy Smolen testified he was unaware of at the time.  (TR. 62).  Deputy Eads testified he was aware the audio and video in their interview room had not been functioning for four years.[4]  (TR. 24, 33).  Deputy Eads did not inform Deputy Smolen of this fact, and did not ask Deputy Smolen to turn on his body camera to record the interview.  (TR. 33).

Both Deputy Eads and Deputy Smolen were involved in the interrogation of the Defendant. (TR. 61).  The deputies testified it is standard procedure and policy for an interview with a female interviewee to have two deputies present, and to leave the interview room door open if there is only one deputy.  (TR. 24, 30-31).

Deputy Eads testified that they asked Defendant about her "willingness to cooperate and talk with us," and she "asked if we could promise that she be let go."  Deputy Eads testified he replied, "We can't make promises."  (TR. 25).  Deputy Eads and Deputy Smolen testified that Defendant asked to speak to their supervisor, so they called in Sergeant Stern to speak to her.  (TR. 64).  Sergeant Stern testified Defendant wanted "guarantees" or "promises" about the outcome of

---

[4] Sergeant Stern likewise testified there are two interview rooms, and that the recording equipment in one of the interview rooms had not been functional for three to four years.  (TR. 79-80).

5

the interview; he told her they "can't make any promises" due to procedures and that they are "in no position to make any promises, as far as what the outcome is going to be" because that is "up to . . . a judge." (TR. 77-78). Deputy Eads likewise testified that Sergeant Stern advised Defendant they "can't make promises . . . especially since she's on probation." Deputy Eads testified Defendant was not happy but appeared to understand. (TR. 26).

Deputy Eads testified he advised Defendant of her *Miranda* rights after she spoke to Sergeant Stern. (TR. 26). Deputy Eads filled out a Douglas County Sheriff's Rights Advisory Form, inputting Defendant's name, date of birth, the case number, place of the interview, the time it started, the officers involved, and the time Defendant was advised of her rights—10:34 p.m. (TR. 26-27, 63; Ex. 1). The deputies testified that Defendant Eads read each right on the form out loud to Defendant, and that Defendant acknowledged yes, she understood each right as read to her. (TR. 27, 63). Deputy Eads wrote Defendant's affirmative answers after each right advisement, and Defendant herself signed the form. (TR. 31-32).

Deputy Eads testified that Defendant's demeanor was "annoyed, irritated with us" but that she did not appear to be under the influence and seemed coherent. Deputy Eads testified that Defendant communicated "very effectively" with them, and he did not have any difficulties understanding her responses to his questions. Deputy Eads testified he made no promises or threats. (TR. 28). He described the interview as, "We just talked back and forth," and Defendant explained "who and where she was getting her methamphetamine from" and "how the process went." (TR. 28). Deputy Eads testified the interview lasted "about an hour or two." (TR. 28-29). Deputy Eads testified Defendant never asked for an attorney or asked that the questioning cease. If she had, they would have stopped the interview and "booked" her. (TR. 29).

Deputy Eads testified they asked Defendant if he could search her phone, and she agreed. (TR. 30). According to Deputy Smolen, Defendant unlocked her phone for officers to go through conversations between her and the drug trafficking organization couriers and/or organizers. The deputies did not have Defendant sign a written consent form because she provided verbal consent. (TR. 64).

Deputy Smolen also testified that during the interview Defendant did not ask for an attorney or for officers to stop questioning her. Deputy Smolen likewise testified he never made any threats or promises, and told Defendant they "cannot make any promises to the outcome of the interview" when Defendant asked if they could promise any sort of outcome. (TR. 29, 63).

6

Deputy Smolen and Sergeant Stern both testified that Defendant requested a promise in exchange for cooperating with the interview and asked the supervisor for such promise, she was denied such promise. (TR. 63-64, 78).

Defendant is now charged in the Superseding Indictment with one count of possession with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, and is charged with several co-defendants with conspiracy to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine. (Filing No. 31).

Defendant has filed the instant motion to suppress all physical evidence and statements obtained from the traffic stop and her interrogation. (Filing No. 22-1). Defendant argues the traffic stop was unduly and illegally prolonged in violation of the Fourth Amendment when Deputy Smolen called for the K-9 unit without reasonable suspicion, and that evidence obtained from the resulting warrantless search must be suppressed. (Filing No. 22-1 at pp. 1-2). Next, Defendant argues that statements made during her custodial interview must be suppressed because her waiver of *Miranda* was involuntary. Defendant asserts she was alone in a room with two male deputies who had a "significant" size discrepancy, her interview occurred after a "drawn out" encounter in a parking lot, and that the signature on the *Miranda* waiver form "is not even a signature at all." (Filing No. 22-1 at pp. 7-8).

The Government responds that Deputy Smolen had reasonable suspicion that Defendant was involved with criminal activity "based on her brief meeting with known drug couriers," justifying her continued detention and calling of the K-unit to investigate. (Filing No. 35 at p. 5). Alternatively, the Government argues that even if the Court finds there was no reason for the officers to search the car before the K-9 unit arrived, the inevitable discovery doctrine applies because the subsequent K-9 alert provided probable cause for the warrantless search. (TR. 7). The Government also contends Defendant was properly advised of her *Miranda* rights and voluntarily waived them when she signed the Rights Advisory Form. (Filing No. 35 at p. 6).

## ANALYSIS

### I.  Defendant's Detention

Defendant does not dispute that the initial stop of the Nissan was justified "because the defective brake light and license plate established probable cause for a traffic stop." (Filing No.

22-1 at 4). However, Defendant contends the stop was unduly prolonged without reasonable suspicion of criminal activity in violation of the Fourth Amendment by her continued detention to wait for the drug K-9 to arrive. (Filing No. 22-1 at 7).

"A police officer 'may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "This includes the right to 'briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity.'" *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007) (quoting *United States v. Hensley*, 469 U.S. 221, 226 (1985)). Courts "consider the totality of the circumstances when determining whether an officer has a particularized and objective basis to suspect wrongdoing." *United States v. Robinson*, 670 F.3d 874, 876 (8th Cir. 2012). "When a team of law enforcement officers is involved in an investigation, the issue is whether all the information known to the team provided 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the investigative stop." *Winters*, 491 F.3d at 921 (quoting *United States v. Robinson*, 119 F.3d 663, 666 (8th Cir. 1997)).

"A lawful traffic stop becomes unlawful if its duration is improperly extended." *United States v. Kitchen*, 149 F.4th 1019, 1024 (8th Cir. 2025), *reh'g denied*, No. 24-1777, 2025 WL 2659221 (8th Cir. Sept. 17, 2025) (citing *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)). But "[a]n officer's mission may evolve during the stop, as when the officer develops 'reasonable suspicion of drug-related activity during the routine traffic-stop tasks.'" *United States v. Moua*, 145 F.4th 929, 935 (8th Cir. 2025) (quoting *United States v. Rederick*, 65 F.4th 961, 967 (8th Cir. 2023)). "[L]aw enforcement must be 'reasonably diligent' in carrying out [a traffic stop's] mission," *Rederick*, 65 F.4th at 966 (quoting *United States v. Magallon*, 984 F.3d 1263, 1278 (8th Cir. 2021)), including their efforts to "complete[ ] a number of routine but somewhat time-consuming tasks related to [a] traffic violation.'" *United States v. Ovando-Garzo*, 752 F.3d 1161, 1163 (8th Cir. 2014) (quoting *United States v. Riley*, 684 F.3d 758, 764 (8th Cir. 2012)). Those tasks may "include a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning." *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013) (citation omitted). "Whether a detention is reasonable presents 'a fact-intensive question, measured in objective terms by examining the totality of the

circumstances.'" *United States v. Strawther*, 125 F.4th 860, 864 (8th Cir. 2025) (quoting *United States v. Englehart*, 811 F.3d 1034, 1041 (8th Cir. 2016)).

After review, the undersigned magistrate judge finds that the totality of the circumstances demonstrate Defendant's stop and detention were reasonable under the Fourth Amendment. The record establishes Defendant's Yukon came to the attention of task force officers by chance during the course of an unrelated fugitive investigation. Deputy Smolen testified that in the late evening hours during their fugitive investigation surveillance, he saw a Nissan pull into the laundromat parking lot where law enforcement were conducting their operation; surveilling officers were able to determine it was the same Nissan they observed delivering a pound of methamphetamine to an informant during a controlled buy earlier in the day based on matching license plates. Deputy Eads further testified he was "able to positively ID" the individuals in the Nissan as the same Hispanic male drug couriers observed during the morning controlled buy, which was conducted as part of a larger investigation into a Mexican cartel trafficking drugs in the area. Deputy Smolen testified he observed this Nissan—known to the deputies to be driven by drug couriers—park next to Defendant's Yukon, saw Defendant exit the Yukon and enter the Nissan's backseat for three to five minutes, and then observed Defendant return to her Yukon and drive away. Deputy Smolen communicated his observations to the other surveilling officers, and immediately afterwards Deputy Eads observed Defendant park the same Yukon near him, pop its hood, and place a black bag under the hood before driving away. Although Deputy Smolen testified he could not see whether Defendant had left the Nissan carrying a black bag, the deputies' testimony reflects that these sequence of events occurred in quick succession. Deputy Eads is an experienced law enforcement officer and testified that, based on his experience, the above conduct is typical of an individual attempting to hide narcotics. See *United States v. Ortiz-Monroy*, 332 F.3d 525, 529 (8th Cir. 2003) ("In forming a basis for suspicion, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."); *United States v. Bustos-Torres*, 396 F.3d 935 (8th Cir. 2005) (holding reasonable suspicion justified a traffic stop of car and pat-down searches of the car's occupants after an officer observed what appeared to be a hand-to-hand drug sale in a parking lot).

At the time Deputy Smolen stopped Defendant's vehicle at approximately 9:06 p.m., the investigating deputies had the above information, in addition to Defendant's admitted traffic

violations regarding the malfunctioning brake light and improperly displayed license plate. Nevertheless, Defendant argues reasonable suspicion to expand the stop to include a drug investigation was lacking because no "objective" evidence or "footage of the 'surveillance' exists" and there is no "concrete proof" such as facial recognition to identify the alleged drug couriers. (Filing No. 22-1 at pp. 6, 11). However, "concrete" proof or video footage is not required to establish reasonable suspicion. An officer's credible testimony regarding his or her observations may be sufficient to satisfy the government's burden to show probable cause or reasonable suspicion for a stop. See *United States v. Stewart*, 32 F.4th 691, 693-944 (8th Cir. 2022); *United States v. Mendoza*, 677 F.3d 822, 827-28 (8th Cir. 2012). The undersigned magistrate judge finds the testifying deputies to be credible, as nothing about their testimony is "internally inconsistent," "implausible on its face," or contradicted by extrinsic evidence. See *Strawther*, 125 F.4th at 864 (quoting *United States v. Harper*, 787 F.3d 910, 914 (8th Cir. 2015)).

Defendant also contends her observed behavior of getting into the Nissan was "innocuous," particularly where officers did not see what happened inside the vehicle. However, the totality of the circumstances may support a reasonable suspicion of criminal activity even if an officer does not actually observe a drug exchange. See, e.g., *United States v. Coleman*, 603 F.3d 496, 500 (8th Cir. 2010). "[C]onduct which would be wholly innocent to the untrained observer . . . might acquire significance when viewed by an agent who is familiar with the practices of drug smugglers and the methods used to avoid detection." *United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir. 1983) (internal quotations omitted). Reasonable suspicion is "not readily, or even usefully, reduced to a neat set of legal rules," and "allow[s] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *United States v. Betts*, 88 F.4th 769, 774 (8th Cir. 2023) (citations omitted).

The undersigned magistrate judge finds and concludes that the totality of these circumstances provided an objective and particularized basis to believe Defendant was engaged in drug activity, and that Defendant's detention while deputies conducted an investigation into those suspicions was not unlawful. Both prior to and during the course of the lawful traffic stop, deputies developed reasonable suspicion of drug-related activity justifying detention of Defendant to pursue additional investigation, including detaining Defendant for a drug K-9 to arrive. Review of the testimony and body camera footage reflect the deputies' actions and questions during the encounter were directed toward investigating both the traffic violation and towards their narcotics

investigation, although it was apparent they were primarily pursuing the narcotics investigation. Deputy Smolen told Defendant about the traffic violations, asked for her and her passenger's identification, asked for the Yukon's documents, asked Defendant where she was coming from, and asked the occupants' to exit the vehicle, all of which are standard and permissible actions during a traffic stop.  See *United States v. Payne*, 534 F.3d 948, 951 (8th Cir. 2008) ("After stopping a vehicle, an officer has the authority to ask the driver what his or her destination and purpose is, check the driver's license and registration, or request that the driver step out of the vehicle.").

Defendant was stopped at approximately 9:06 p.m., deputies processed the stop and the vehicle's information—resulting in the arrest of the passenger on an outstanding warrant—and approximately twenty minutes after being stopped (prior to the drug K-9's arrival), Defendant admitted to deputies that she had marijuana in her Yukon.  A vehicle's occupant's admission that there is marijuana in the vehicle during a traffic stop establishes probable cause to search the vehicle for that marijuana, and if marijuana is found then law enforcement have probable cause to search the entire vehicle.  *United States v. McCarty*, 612 F.3d 1020, 1026 (8th Cir. 2010) ("[The defendant] admitted that there was marijuana in his car. This admission established probable cause to search for the marijuana.  The discovery of the marijuana provided probable cause to search the entire vehicle.") (citing *United States v. Hernandez-Mendoza*, 600 F.3d 971, 976 (8th Cir. 2010) and *United States v. Olivera-Mendez,* 484 F.3d 505, 512 (8th Cir. 2007)).  Here, when Defendant admitted to having marijuana in her Yukon, probable cause arose to support the deputies' warrantless search of her vehicle for the marijuana.  See *McCarty,* 612 F.3d at 1026.  The discovery of the marijuana then gave the deputies probable cause to search the entire vehicle.[5]  Under these circumstances, Defendant's detention for approximately twenty minutes before probable cause for the search arose was not unreasonable under the Fourth Amendment.  See, e.g., *United States v. Moua*, 145 F.4th 929, 935 (8th Cir. 2025) (recognizing there is no "per se time limit" on traffic stops and concluding the 45-minute total stop was not unreasonable to pursue the stop's mission of a license plate infraction and suspicion of impaired driving that arose during the stop); *United States v. Murillo-Salgado*, 854 F.3d 407, 416 (8th Cir. 2017) (finding a 23-minute stop—beginning

---

[5] At the evidentiary hearing, the Government also raised the inevitable discovery doctrine as an alternative basis for the search because the drug K-9 later arrived and also alerted to the odor of narcotics on the driver's side of the Yukon. (TR. 7).  This argument is unnecessary for the Court to address having concluded the warrantless search was valid based upon Defendant's admission there was marijuana in the vehicle.

as a traffic stop but evolving into an investigatory stop—was not an unconstitutional delay because the officer developed reasonable suspicion of drug-related activity during the routine traffic-stop tasks); *Magallon*, 984 F.3d at 1279 ("[A]ddressing the suspicion of drug activity require[s] time."). Accordingly, the undersigned magistrate judge finds and recommends that Defendant's motion to suppress evidence obtained from the warrantless search of the Yukon be denied.

## II.      Defendant's Statements

Defendant further moves to suppress her statements during her subsequent custodial interrogation because the Government cannot meet its burden to prove that her *Miranda* waiver was voluntary.  (Filing No. 22-1 at p. 7).  The Government counters that Defendant was properly advised of her *Miranda* rights and voluntarily waived them when she signed the Rights Advisory Form.

*Miranda* warnings are required when an individual has been subjected to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).  Although the requirement that a *Miranda* warning be given does not dispense with the voluntariness inquiry, "'[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.'" *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001) (quoting *Dickerson v. United States*, 530 U.S. 428, 444 (2000)).  The central question in evaluating voluntariness "is whether the defendant's will was overborne." *Haynes v. Washington*, 373 U.S. 503, 513 (1963) (quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)); see also *United States v. Sandell*, 27 F.4th 625, 630 (8th Cir. 2022).  To answer that question, the court examines "both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure." *United States v. Monteer*, 83 F.4th 1119, 1123 (8th Cir. 2023) (quoting *Sandell*, 27 F.4th at 630). "[T]he degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition" are all relevant factors. *United States v. Magallon*, 984 F.3d 1263, 1284 (8th Cir. 2021) (quoting *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011)).  "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Magallon*, 984 F.3d at 1284 (quoting *LeBrun*, 363 F.3d at 724).

12

The briefing and arguments offered by the parties indicate that Defendant seeks to suppress statements she made during a custodial interview after being advised of *Miranda*. The actual recitation of *Miranda* and Defendant's statements and interview were not offered as evidence in this matter because, somewhat troublingly, Deputy Eads testified the interview room where the interrogation took place did not have a functioning audio and video recorder—and had not had a functioning recording system for four years, a fact which was known to Deputy Eads prior to the interview. Nevertheless, "the Constitution does not mandate electronically recording a defendant's custodial interrogation," *United States v. French*, 719 F.3d 1002, 1007 (8th Cir. 2013), and the undersigned magistrate judge finds the deputies testimony credible regarding the circumstances of Defendant's interrogation.

Both Deputy Eads and Deputy Smolen were involved in the interrogation of the Defendant, testifying it is standard procedure and policy for an interview with a female interviewee to have two deputies present. Deputy Eads testified they asked Defendant about her "willingness to cooperate and talk with us," and she "asked if we could promise that she be let go." The deputies both told Defendant they cannot make promises, and called in Sergeant Stern to speak to Defendant when she asked to speak to their supervisor. Sergeant Stern likewise testified Defendant wanted "guarantees" or "promises" about the outcome of the interview, and he too told her they cannot make any promises. Deputy Eads testified he advised Defendant of her *Miranda* rights after she spoke to Sergeant Stern, reading each right on the Rights Advisory Form out loud to Defendant. The deputies both testified that Defendant acknowledged yes, she understood each right as read to her, and Defendant signed the form. (Ex. 1).

Defendant argues that the signature on the Rights Advisory Form was not voluntary because the signature "is not even a signature at all" and "is nothing more than a nonsensical, squiggly line without a single discernible letter." (Filing No. 22-1 at p. 8). However, "A voluntary waiver need not assume and particular form; it may be made in writing on a printed format, or it may be made orally by replying to questions." *United States v. Zamarripa*, 544 F.2d 978, 981 (8th Cir. 1976) (citing *United States v. Johnson*, 529 F.2d 581, 584 (8th Cir 1975); *Moore v. Wolff* 495 F.2d 35, 37 8th Cir. 1974)); *see also Klingler v. United States*, 409 F.2d 299, 308 (8th Cir. 1969) (holding that an oral statement can indicate an acknowledgement and understanding of rights and constitutes a knowing and voluntary waiver of *Miranda* even if the form was not signed). "The

13

validity of a waiver is to be determined from all the surrounding circumstances." *Id.* (citing *United States v. Marchildon*, 519 F.2d 337, 343 (8th Cir. 1975)).

Defendant asserts that her purported waiver of *Miranda* was involuntary because it was "a product of implicit intimidation and coercion" as there was a "considerable size discrepancy" between Defendant and the deputies and the interview was conducted at 10:00 P.M. after a "drawn out" interaction at the Walgreens. (Filing No. 22-1 at p. 8). However, the surrounding circumstances as testified to by the deputies reflects Defendant voluntarily waived her rights under *Miranda*. The Rights Advisory Form reflects the interview commenced at approximately 10:34 p.m. (Ex. 1), which is only one-and-a-half hours after Defendant was first stopped by Deputy Smolen. Deputy Eads testified that Defendant's demeanor during the interview was "annoyed, irritated with us," but she did not appear to be under the influence of any substances and seemed coherent. Deputy Eads testified that Defendant communicated "very effectively" with them, and he did not have any difficulties understanding her responses to his questions. Deputy Eads testified he made no promises or threats. He described the interview as, "We just talked back and forth," and that the interview lasted "about an hour or two." Deputy Smolen likewise testified he never made any threats or promises and that it was a "fairly cordial conversation." (TR. 63). Both deputies testified Defendant never asked for an attorney or asked that the questioning cease. Defendant was on probation at the time of these events, meaning she had some familiarity with the legal system. The undersigned magistrate judge has also reviewed the body camera footage contained in Exhibits 2-6 offered as evidence in this matter, and notes that Defendant appeared coherent and not under the influence of any substances during the stop, and was not restrained until deputies recovered narcotics after searching her vehicle. Nor does the body camera footage contain evidence of threats, strong arm tactics, or other coercive tactics by law enforcement that would render Defendant's subsequent in custody statements following a *Miranda* advisement involuntary. Based on the record before the Court, there is no evidence to conclude Defendant's "will and capacity for self-determination" were overborne requiring suppression of her custodial statements after being advised of *Miranda* and agreeing to speak to the deputies. See *LeBrun*, 363 F.3d at 726. Upon consideration,

**IT IS HEREBY RECOMMENDED** to Robert F. Rossiter, Jr., Chief United States District Court Judge, that Defendant's Motion to Suppress (Filing No. 22) be denied.

14

Dated this 7th day of April, 2026.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

15